UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

James Li,                                         Civil Action No:

                          Plaintiff                     <u>COMPLAINT</u>

                          -and-                        JURY TRIAL DEMANDED

Merrick B Garland, United States Attorney General,
in his official capacity

                          Defendant

-------------------------------------------------------------------


    James Li, (hereinafter "Plaintiff"), by and through his attorney, Raymond Mansolillo, Esq.,

alleges the following upon information and belief against Merrick B. Garland, Unted States

Attorney General, in his official capacity (hereinafter "Defendant").

## <u>NATURE OF THE ACTION</u>

    1.    This is an action brought to address discrimination in employment on the bases of

age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), race, in

violation of Title VII of the Civil Rights Act of 1964, as amended, (Tille VII"), harassment and

retaliation for participating in a protected activity, namely, being a witness and co-worker for a

plaintiff/complainant during an investigation into allegations of age discrimination conducted by

the  Defendant's, Drug Enforcement Administration  (DEA")component's, Office of Equal

Employment Opportunity ("EEO"), in violation of Title VII, disability in violation of the

Rehabilitation Act of 1973, as amended and harassment and retaliatory hostile work environment in violation of both Title VII and the Rehabilitation Act of 1973, as amended.

2.     This action seeks compensatory and punitive damages to secure redress for past deprivation of rights secured to the Plaintiff under federal, state and local law.

3.     Plaintiff alleges, *inter alia*, that he Defendant by and through its DEA component personnel, forced him to withdraw from the DEA Polygraph Unit as a result of continuous harassment, retaliatory conduct, age discrimination, race discrimination and disability discrimination and overly and unjustified criticisms of his work product, attacks on his integrity and ethical behavior, forced limited duty, adverse employment evaluations and retaliated against him for participating in a co-worker's EEO claim against the same or similar DEA supervisory employees and as a member of one or more protected classes of employees, namely over the age of 40, Asian (Chinese), disability (asthma), and sex (male).

## JURISDICTION AND VENUE

4.     The jurisdiction of this Court is invoked pursuant to Civil Rights Act of 1964, as amended , 42 U.S.C. §2000e- *et seq*., Rehabilitation Act of 1973, as amended., 29 U.S.C. §§501-504 and 701, and The Age Discrimination in Employment Act, 29 U.S.C §621 *et seq.,* 28 U.S.C. §§1331 and 1343(a)(4), and 28 U.S.C. §1367(a).

5.     The venue of this Court is invoked because Plaintiff's assigned work location and many of the operative facts and communications related thereto occurred within this District.

6.  Plaintiff has exhausted all of his administrative remedies. Plaintiff filed his Formal Complaint on December 12, 2021.  Plaintiff filed his Request for Hearing before the Equal Employment Opportunity Commission ("EEOC") on October 10, 2022. On May 19, 2024 the

EEOC Administrative Judge issued a dismissal for the purpose of filing a federal court complaint.  The  time period in which to file the federal court complaint has not expired.

## **PARTIES**

7.    Plaintiff is currently 50 years old and is a resident of  Brooklyn, New York. He is Asian (Chinese), with English as his second language has a disability (asthma) and is a male.

8.    Plaintiff was, at all times relevant to the instant matter, employed by the Defendant's DEA component as a Special Agent, Series 1811, Criminal Investigator primarily assigned to the New York Field Division ("NYFD"), located in New York, New York.  At all times relevant hereto Plaintiff was assigned under the Table of Organization for the NYFD and reported directly to the management team at the DEA New York Field Division.

9.    Defendant is the United States Attorney General who oversees the operation of the United States Department of Justice in which the DEA is a component law enforcement agency.

10.    Upon information and belief, at all times relevant to the instant matter, Defendant, through its DEA employees, individually and collectively, constitute an employer as defined by the ADEA, Rehabilitation Act of 1973, as amended and Title VII of the Civil Rights Act of 1964, as amended.

11.  The named responsible management officials (RMOs) are:

    a.   Unit Chief Daniel Holcomb ("UC Holcomb")

    b.    Staff Coordinator Bernard Malone ("SC Malone")

    c.   Assistant Special Agent in Charge Mary Toomey ("ASAC Toomey")

    d.   Special Agent in Charge Michael Machak (SAC Machak")

    e.    Special Agent Frank Sampson  ("SA Sampson") (forced to leave the polygraph

unit for some unknown reason.

    f.   Special Agent Joseph Collins  ("SA Collins")

    g.   SA Sameer Poules (SC Poules") Staff Coordinator

    h.   Special Agent Jessie Stephenson  ("SA Stephenson")(who was forced to leave the polygraph unit in 2023 for some unknown reason) and other yet identified DEA personnel who assisted the RMOs in engaging in the discriminatory and retaliatory actions against the Plaintiff.

## FACTUAL ALLEGATIONS

12.    On August 2, 1998 Plaintiff entered the DEA Training Academy.  Upon graduation he was assigned to the San Francisco Field Division as a Special Agent ("SA"), Series 1811, Criminal Investigator.

13.    In 2002, Plaintiff was assigned to the NYFD.  On or about 2007, based on his known proficiency in numerous computer applications he was assigned to the position of Division Training Coordinator for the NYFD.

14.    From April 23, 2013 through July 24, 2013, Plaintiff attended the National Center for Credibility Assessment Countermeasure Course-Psychophysiological Detection of Deception, a/k/a Polygraph School. Subsequent thereto, Plaintiff was a DEA Certified Polygraph Examiner assigned to the NYFD where he primarily conducted polygraph examinations for the NYFD recruits for Special Agents and Intelligence Research Specialists.

15.    During his tenure as a DEA polygraph examiner, Plaintiff, also conducted a number of out-of-state and out-of-country polygraph examinations for the DEA polygraph unit with the approval of NYFD senior management on a temporary basis ("TDY" meaning temporary duty yonder).

16.    Plaintiff served as a DEA Certified Polygraph Examiner from on or about July 2013

to August 2021 when he was forced to withdraw from the polygraph program due to racial, age, sex and disability discrimination and enduring a harassing and hostile and retaliatory work environment and retaliation for participating in protected activity described below.

17.    At all times relevant hereto, Plaintiff continued to attend numerous polygraph examiner training sessions including a special countermeasures course. He also attended the DEA Polygraph Conference in Lorton, Virginia on May 16-22, 2021 which is in issue and discussed below.

18.    Plaintiff was aware that his position as the sole Asian polygraph examiner, came with unwarranted and offensive racially discriminatory actions and words yet he endured them and performed his services in an exemplary and outstanding manner both as a NYFD Special Agent and Special Agent Polygraph examiner.

19.    In 2016, when on a TDY assignment  to Afghanistan with two other polygraph examiners, references were made to his use of the Chinese language in a telephone call as that "ching, chang and chong" language.  It was hurtful but Plaintiff endured it.

20.    In 2018, during a DEA polygraph unit meeting with all of the polygraph examiners present, one of the examiners copied Plaintiff's Passport and posted it on a large screen in a large meeting room with the addition of a Fu Manchu moustache which Plaintiff had never worn. Polygraph senior management posted the doctored passport which included all of Plaintiff's personal information including his date of birth during a presentation and they did nothing about such an obvious discriminatory act.

21.    Plaintiff performed his services as a DEA Special Agent in the NYFD and as a Polygraph Examiner without serious issues until 2019 when the discriminatory and retaliatory attacks on him began in earnest.

FIRST CAUSE OF ACTION

RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF

1964, AS AMENDED

22.    Plaintiff repeats and realleges Paragraphs 1 through 21 of the Complaint as if fully set forth herein.

23.    In early 2019, SA Harris complained that she was being harassed.  She filed a grievance or EEO complaint against then senior management of the polygraph unit ("STCP") including UC Daniel Holcomb and ASAC Mary Toomey .  She also filed a complaint with the DEA Office of Professional Responsibility ("OPR") and, to the best of Plaintiff's knowledge, with the Office of Special Counsel ("OSC") reporting systemic corruption in the polygraph unit management wherein management was trying to predetermine polygraph examination results to appease DEA Headquarters hiring  pressure and also to provide preferential treatment to applicant's with connections to DEA Management such as friends and relatives of current and former DEA supervisory personnel.

24.    Plaintiff was a friend of SA Harris and it was understood that SA Harris was being harassed and singled out by ASAC Toomey and STCP management for removal from the polygraph unit and program.

25.    Upon information and belief, Plaintiff was singled out for discriminatory and retaliatory actions in order to deflect the polygraph unit management personnel were doing to SA Harris.

6

The intent of STCP management was to show that not only SA Harris was being harassed but so was the Plaintiff despite being unjustified.

26.    Plaintiff was told by a retired STCP Unit Chief that he was singled out for discrimination, harassment and retaliation because  he was "Asian and he was the quiet one in the group" implying that he would not complain about being treated in an unlawful manner and in violation of DEA policies based on his race, color and national origin.

27.    On or about April 13, 2019, the discriminatory acts, harassment and hostile work environment began in earnest. When Plaintiff was advised that Staff Coordinator Poules ("SC Poules") had conducted a "Second Opinion" review on a polygraph examination Plaintiff had conducted earlier.  SA Poules said there were some physiology issues with his exams lately. The examination in question indicated that the examinee had attempted to use countermeasures during the examination, basically trying to cheat. SA Poules agreed with the findings but wanted to discuss the examination with the Plaintiff and call Plaintiff a week later. Plaintiff called SC Poules who said that he was willing to send Plaintiff to Missouri to be monitored by SA Stephenson.

28.    Plaintiff told SA Poules that there were less than stellar applicants recently and the number of countermeasure cases had increased to which SA Poules agreed. SC Poules did not require Plaintiff to go to Missouri.  This action by SA Poules coincided with what was happening to SA Harris.

29.    In April/May 2019, SA Stephenson informed Plaintiff that she was told to conduct a review on one of Plaintiff's examinations  and that three others were going to be done by SC Poules, SA Petrarca and SC Lambert. This was continued harassment of Plaintiff because of the SA Harris claims. Plaintiff is unaware as to the results of these reviews.

30.   In June/July 2019, SC Lambert asked Plaintiff to travel to STCP Headquarters for a week to assist with examinations.  It did not make sense to the Plaintiff because STCP had three examiners and a fourth, SA Harris, in the area. SA Sampson called Plaintiff and told him he had been at STCP to assist with exams.  Plaintiff told him he believed he was being monitored which SA Sampson  saying STCP just needed help with a backlog of exams.  This was a misleading response because in July SA Alexander informed Plaintiff that he was asked to monitor Plaintiff's exams while he was at STCP. SA Alexander said "he did not ask for this". SA Alexander would travel from Denver, Colorado to Lorton Virginia to participate in Plaintiff's reviews for one week. This was happening as Plaintiff  had been told by a retired special agent and also mentioned to him by UC Holcomb later that he was being "f---ked with" during this period of time.  STCP staff was setting Plaintiff up to attack his work and his speech as an Asian American as a pretext for discriminating against him.  UC Daniels had told him prior to arriving at STCP to slow down his speech during the review.

31.   Plaintiff reported to STCP from July 28 to August 2, 2019. Allegedly to conduct exams. Prior to the first exam, SA Alexander told Plaintiff that Plaintiff was a senior examiner who knew what he was doing but should just slow down his speech, another act regarding Plaintiff's Asian race.

32.   While Plaintiff was at STCP he  met with retired UC Brent Barnes who confirmed that Plaintiff was summoned to STCP to deflect that STCP personnel were singling out SA Harris for removal from the polygraph program and Plaintiff, as the quiet Asian was being used for STCP management purposes to continue to attack, discriminate and retaliate against SA Harris for her protected activity.

33.   Plaintiff was monitored during his time at STCP and when he was leaving, he asked for a

copy of the CER's (reviews) but never received them because there was nothing wrong with his exams. Nothing ever came from the CERs. It was a sham. It was an attempt to show him what could happen to him if he supported SA Harris in her grievance or EEO complaints against ASAC Toomey and others in the Agency.

34.    On his last day, he was told by STCP UC Daniels that Plaintiff knew what he was doing just slow down. Prior to 2019, Plaintiff had never been approached about his speech or the speed with which he spoke by anyone at STCP or any examinee. He was being discriminated against because he was Asian and he served their purpose with SA Harris.

35.    Plaintiff had conversations with both SA Harris and STCP Program Analyst Carrie Sedlacek and both believed that he was summoned to STCP for the benefit of ASAC Toomey who was intent on removing SA Harris from the polygraph program. In fact, Plaintiff was told that no other examiners were summoned to STCP to be monitored during that same period of time.

36.    In 2019, Plaintiff asked now retired  SAC Jesse Fong if his speech was an issue for his position as a polygraph examiner.  SAC Fong told him his tempo was not an issue.

37.    The STCP management including UC Holcomb and others had a bias against Asian males in particular. On or about October 2020, the second spot for a NYFD polygraph examiner was announced specifically for New York City.  SA Steven Soo Hoo, an Asian male, applied for the position.  SA Lambert informed SA Soo Hoo he made the best qualified list and UC Holcomb and ASAC Toomey were copied on the email.  SA Soo Hoo told the Plaintiff that the manner in which SA Lambert conducted the interview was more of an attempt to talk him out of the position by emphasizing the negatives rather than a positive approach. UC Holcomb asked Plaintiff about SA Soo Hoo.  Plaintiff explained that he was intelligent and could easily learn what was necessary to become a polygraph examiner. UC Holcomb, demonstrating his bias

against Asian males, also asked if he was Chinese which should not have had a bearing on the position but was important to UC Holcomb and STCP.

38.  In January 2021, the position was suddenly reannounced  and the position was moved to Buffalo, NY.  SA Stephenson, while attending a Quality Control Roundtable was told by UC Holcomb that no one applied for the New York position that was announced in October so they re-announced for Buffalo, NY.  It was a blatant lie and was a cover-up of UC Holcomb's and other STCP manager's discriminatory attitude towards Asian American males in the polygraph unit for applying for such a position.  It is direct evidence of UC Holcomb's bias against Asian males in the polygraph group.

39.  Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by and/or resulted from Plaintiff's involvement in the aforementioned Harris grievance,  report to the Office of Special Counsel and the DEA OPR.

40.  Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper.

## SECOND CAUSE OF ACTION

## RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,  AS AMENDED, FOR PARTICIPATING IN PROTECTIVE ACTIVITY AND RETALIATORY HOSTILE WORK ENVIRONMENT

41.   Plaintiff repeats and realleges Paragraphs 1 through 40 of the Complaint as if fully set forth herein.

42.  The James Matt EEO claim, as occurred in the SA Harris claim, is a basis for Plaintiff's

claims of retaliation and retaliatory hostile work environment claims by the Plaintiff.

43.  In September 2018, James Matt applied for a position with the STCP and was accepted after waiting nearly sixteen  months to attend the NCCA (Polygraph school) and he was upset that others were allowed to attend the NCCA before he was allowed to do so.

44.  Plaintiff was told by SA Alexander that he, Alexander, had heard that SA Matt was an a**hole.  Plaintiff was also told that SA Matt "has been a pain in the ass" by UC Anessa Daniels-McCaw ("SA Daniels").   Plaintiff advised UC Daniels that he would not get involved in any hostilities and would isolate himself.  Sometime thereafter, because of the negative comments about SA Matt, Plaintiff advised him to stay under the radar, graduate from NCCA, get through the mentorship and certification as a DEA polygraph examiner. Plaintiff also told SA Matt that there is a lot of scrutiny at STCP and STCP management was looking to remove examiners from the program. SA Matt replied that he was not afraid of  STCP management and he was good friends with UC Daniels.

45.  SA Matt graduated from NCCA in March 2020 and was sent to Boston to conduct exams under the guidance of Boston Field Division  SA/examiner William Petrarca. Plaintiff received a call from SA Sampson in Philadelphia that SA Petrarca despised SA Matt and attacked SA Matt's work ethic.

46.  On July 15, 2020, Plaintiff received a text message from SA Stephenson  that SA Matt's exams were " the biggest cluster f---k of an exam I have ever seen".  Two days later she did the same saying Matt's exam was a "s—t show". In September, SA Matt, while scheduled for a series of polygraph exams with mentor Joseph Collins ("SA Collins") was dismissed from the polygraph program by UC Holcomb.  As will be set forth below, this is the same tactic used to force Plaintiff to withdraw from the polygraph program in August 2021.

47.   Sometime thereafter, SA Matt filed an EEO complaint alleging age discrimination against the DEA with respect to the actions of UC Holcomb and others.

48.   UC Holcomb, contrary to DEA policy and EEO policy, contacted the Plaintiff and told Plaintiff that SA Matt had filed a "grievance" against him. UC Holcomb said SA Matt stated that Plaintiff had made certain statements to SA Matt about STCP. UC Holcomb stated to Plaintiff, "Now, before I ask if you said anything, I want you to know that Jimmy Matt said other people had made statements to him and that he (UC Holcomb) spoke to those same people  and they denied making any statements".  So let me ask you, did you pull Jimmy Matt aside and tell him he was being targeted for removal from polygraph?"  Plaintiff admitted he pulled him aside but that was not what he told him.  Nothing further was said. Plaintiff believed that UC Holcomb was attempting to influence him in some way regarding the EEO complaint and what Plaintiff may say in the future.

49.  On or about April 21, 2021, UC Holcomb approached Plaintiff and told him "I know they were f---king with you previously" meaning the actions of ASAC Toomey in 2019 to scrutinize Plaintiff's work performance and discredit his exams to use that to deflect he real intention to remove SA Harris from the polygraph unit/program due to SA Harris' grievance and unfair labor practice reports.  Plaintiff knew UC Holcomb was attempting to manipulate him to provide favorable statements regarding the SA Matt situation and have Plaintiff file a complaint against ASAC Toomey for UC Holcomb's benefit. UC Holcomb complimented Plaintiff on his performance by stating that Plaintiff "collects very good charts" (polygraph exams).  He further stated that he had no problem with the Plaintiff. Plaintiff believes that UC Holcomb portrayed himself as a "big brother" if anyone bothered him.

50.   On April 16, 2021, Plaintiff was telephonically interviewed by an EEO investigator regarding SA Matt's pending EEO complaint.  Plaintiff informed the investigator that UC Holcomb had initiated his own inquiry into  SA Matt's EEO complaint.

51.   On May 7, 2021, Plaintiff contacted the EEO investigator and told the investigator that UC Holcomb's comments about being messed with was to manipulate Plaintiff's upcoming EEO testimony.  He told the investigator that it worked because he praised UC Holcomb's professionalism in Plaintiff's initial interview and said the same about SC Malone. Plaintiff also stated he now realized that it was inappropriate for UC Holcomb to be conducting his own investigation when he, UC Holcomb, was likely the one SA Matt complained about in SA Matt's EEO case.  This information was passed on by the investigator to both UC Holcomb and SA Malone  as part of the EEO investigative process. It was later used against the Plaintiff in a retaliatory manner by both UC Holcomb and SA Malone in their efforts to discredit Plaintiff and made his work environment so hostile that it forced him to withdrawal from the polygraph unit a few months later.

52.   The retaliatory actions against the Plaintiff referenced herein occurred shortly after UC Holcomb and SC Malone were made aware of Plaintiff's April 16, 2021 EEO interview content and his additional information supplied to the EEO investigator on May 7, 2021.

53.   On May 22, 2021. SC Malone  requested that Plaintiff travel to Detroit for one week of exams.  He was told he could decide when to conduct the trip. Plaintiff advised SC Malone he would check both his calendar and his wife's calendar and get back to him. SC Malone had no issues with this arrangement.  However, SC Malone and UC Holcomb would use this against him a few months later.

54.  On July 23, 2021, UC Holcomb sent a hostile email to the entire polygraph unit.  UC

Holcomb implied that there were challenges for some and implied that not much work was

getting done. He referenced the Roman practice of decimation for every tenth individual. It was

intimidating  and also indicated SC Malone was working with UC Holcomb.  It was devastating

for an Asian male  to read such threatening verbiage given the degree and content of Asian hate

crimes since the start of the Covid-19 pandemic.

55.  In that same email, UC Holcomb addressed possible issues of distraction and stated that

"your priorities should be in an order resembling this: a. your health, b. your family's health … e.

everything else.  This  language contradicts how UC Holcomb and SC Malone treated Plaintiff

on August 16, 2021.

56.  On July 28, 2021, UC Holcomb, with a copy to SC Malone, asked that Plaintiff drop

everything and summoned Plaintiff to STCP in Lorton, Virginia for August 11, 2021. Plaintiff

contacted SC Malone for an explanation as to the topic of the meeting and never received a reply.

57.  On July 29, 2021, concerned about the meeting and its urgency, Plaintiff told  ASAC

Wesley Fritz (New York Field Division) who suggested that Plaintiff contact UC Holcomb.

Plaintiff emailed both UC Holcomb and SC Malone asking about the purpose of the meeting so

he could be prepared. Plaintiff was told that there were some questions about recent exams he

had performed and that the meeting was about "continuous process improvement".  Plaintiff was

told that there was nothing to prepare to just come with an open mind and positive attitude.  It

was a lie. Rather, it was a meeting designed to be a hostile meeting wherein the Plaintiff would

be viciously and unjustly attacked for his work product, work ethic, integrity and personal and

professional ethics and other accusative actions by both UC Holcomb and SC Malone in

retaliation against Plaintiff for his participation as a witness in the SA Matt EEO complaint.

58.   Later, Plaintiff called SC Malone and was told "this is a Dan thing.  I know you don't know me , but you will be fine."  A false statement because SC Malone knew what was going to happen at the aforementioned meeting.  Plaintiff asked if he should cancel his scheduled trip to Atlanta to conduct exams based on the Holcomb email about distractions. SC Malone said continue with  the travel plans and the exam scheduled for New York.

59.   On August 8, 2021 the meeting for August 11, 2021 was cancelled by UC Holcomb as he and SC Malone had been exposed  to Covid-19. In a call and a text,  UC Holcomb said he would seek a virtual meeting option.  A few hours later, UC Holcomb emailed Plaintiff a new meeting date for August 16, 2021.  Plaintiff knew something was wrong and it caused Plaintiff a great deal of stress.

60.   On August 9, 2021, Plaintiff contacted ASAC Fritz again. He asked for his assistance because all of the changes in dates was making things difficult for childcare and such short notice.  Plaintiff also told ASAC Fritz that he believed this had something to do with SA Matt's EEO case. ASAC Fritz called SC Malone while Plaintiff was in the room with Fritz.  Plaintiff overheard SC Malone say that " he (Plaintiff) needs to take one for the team and he is the least traveled out of everybody, which was not accurate.  SC Malone knew Plaintiff had not received his complete Covid vaccination regimen until February 2021 which limited his travel prior to that date. Plaintiff did not know that he was supposed to take one for the team to mean regarding him.  He was the only Asian American in the entire Polygraph unit team so he had to be the quiet Asian minority member and not complain about how he was being treated or what was going on at STCP regarding SA Matt and SA Harris being a sacrificial lamb.

61.  On August 10, 2021, Plaintiff told NYFD Acting GS Jeany Espinoza about the upcoming travel to STCP.  He also told her that he believed it was related to the SA Matt EEO case.  GS Espinosa said UC Holcomb said he changed the meeting start from 10:00 a.m. to 11:00 a.m. .

62.  On August 15, 2021, 7:00 p.m., while boarding his flight to STCP, UC Holcomb emailed Plaintiff  an attachment with five Comprehensive Evaluation Reviews ("CERs") and one summary audio review to review before the meeting totaling 62 written pages.  Plaintiff was lii-equipped as he only had his cell phone. A CER is a written review of a polygraph examination from listening to the recorded exam's audio. This, after having been told that there was nothing to prepare for the meeting. Plaintiff avers that it was an intentional act by UC Holcomb and SC Malone to prevent the Plaintiff from being prepared for the meeting and to exert undue pressure on him prior to the meeting. The reviewers were not named, 90% hostile, and painted the plaintiff as inept, incompetent, lazy, rude, lacking proficiency in the English language, paranoid about Covid-19, operating unethically and possibly having violated DEA Standards of Conduct. This, despite UC Holcomb once having called the Plaintiff one of his best and someone he could rely on for exams.

63.  On August 16, 2021, the meeting took place. UC Holcomb started the meeting by stating that Plaintiff was there because of productivity issues, performance issues and ethics and policy concerns. Plaintiff had never been accused of such acts at any time in his entire career including the eight plus years as a polygraph examiner.  In fact, in September 2020, just the year prior, UC Holcomb signed a performance evaluation where he rated Plaintiff as Outstanding in his Polygraph work; Plaintiff's work was detailed, accurate and well-written; he was a hardworking and valuable member of the polygraph unit and his "go to agent" for challenging assignments and that he, Holcomb, routinely relied on Plaintiff's expertise, professionalism and exceptional

work ethic. Now, in August 2021, a few months after being interviewed in the James Matt EEO case, UC Holcomb and SC Malone took turns attacking the Plaintiff in every aspect of his work performance, work ethic, professional ethics, productivity, all of which was inaccurate or outright false statements. Plaintiff, upon information and belief, avers that all of the attacks were the result of the Plaintiff's statements in his EEO interview and the additional information he supplied to the EEO investigator.  There is no other reasonable explanation for such conduct by UC Holcomb and SC Malone.

64.   Productivity – SC Malone erroneously said Plaintiff's productivity was "abysmal". SC Malone stated that the Plaintiff  only conducted 26 exams up to August 2021 for that fiscal year. However, SC Malone failed to include exams Plaintiff conducted during domestic and foreign travel. In addition, Plaintiff conducted 40 special agent exams in physical year 2021 up to August 2021. Based on UC Holcomb's and SC Malone's number of 340  exams outstanding for the entire unit, said total of exams equally distributed to the 23 examiners would amount to less than 15 exams per examiner to be conducted. In addition, several examiners, including SA Stephenson, a white female, who had not conducted an exam in over a year and still served as a reviewer of Plaintiff's exams in 2021 at the request of UC Holcomb and SC Malone.

65.   As for foreign and domestic travel, UC Holcomb and SC Malone accused Plaintiff of not engaging in or volunteering for such travel.  Foreign travel was prohibited from March 2020 until basically June 2021.  In addition, Plaintiff did not receive his completed covid vaccinations until February 2021. On April 23, 2021, UC Holcomb stated foreign travel would resume in earnest in early June 2021. In emails in June and July 2021 regarding foreign travel, Plaintiff responded to UC Holcomb that he was available for such travel, proving that the foreign travel

statements of Holcomb and Malone were false. In July 2021 Plaintiff did travel to Colombia to conduct polygraph exams.

66.  In less than a year Plaintiff went form one of the best special agents in the polygraph unit, a "go to agent", to someone whose productivity was abysmal.  The only change was that in April and May 2021, Plaintiff had made statements in SA Matt's EEO case that both UC Malone and UC Holcomb did not appreciate.   He was then a target for retaliation and hostile work environment and discrimination as an Asian male.

67.  UC Holcomb accused Plaintiff of being afraid of Covid-19 and using it to as an excuse to postpone exams.  SC Malone agreed. The reviewers made similar comments. The agency personnel knew that Plaintiff has asthma and was and is in a high-risk category if contracting Covid-19.  It will be addressed below. Plaintiff already had many NYFD exams in his queue and was directed to travel 2 weeks per month. No other examiners, male or female or white were being required to travel this extensively.

68.  Performance issues regarding Plaintiff's polygraph examinations was also discussed. UC Holcomb stated that he ordered the CERs on Plaintiff's cases after receiving a very, very specific complaint from an applicant about mask wearing and questions about the applicant's Covid-19 experience that were allegedly out of bounds. He "farmed" out 6 exams for review. Allegations were made by UC Holcomb that there were recurring themes . First, that the Plaintiff was preoccupied with Covid-19 questions as if he was seeking to postpone the exam.  This is blatantly untrue. Next UC Holcomb alleged Plaintiff took an applicant's temperature 4 times, which is untrue.  Plaintiff took his own temperature twice and the Applicant's temperature twice. UC Holcomb then accused Plaintiff of ending an exam in Colombia because the examinee's temperature was very close to the Covid-19 temperature.  This did not happen.  Upon verifying

that the applicant had the symptom of a Covid-19 temperature, Plaintiff sought guidance from the trip leader, SA Sampson, who then authorized the termination of the exam to minimize the possibility of everyone's exposure to Covid-19. This allegation was fabricated by SA Sampson working in conjunction with UC Holcomb and SC Malone. Both UC Holcomb and SC Malone knew that an examinee's health can impact a polygraph examination so all examiners are trained to assure there are no such issues.  Sometime later, Sampson was  asked to leave the polygraph unit for some unknown reason as was SA Stephenson.

69.   Next, UC Holcomb informed  Plaintiff that there were 7 Administrative Opinions and 2 were Plaintiff's. AOs are exams terminated or where the applicant withdrew from the hiring process.  All AOs are vetted through UC Holcomb, SC Malone or the team members so Plaintiff did not have the authority to AO an exam without approval.

70.   UC Holcomb told Plaintiff that what was more challenging is that in 4 of the 6 CERs there were significant  errors some of which were indefensible including the way Plaintiff  said them. He said Plaintiff's work did  not meet STCP standards and Plaintiff was negatively impacting exams including that Plaintiff talked too fast and told applicant's if he was speaking too fast to ask me to slow down. He said it was called a "rapid fire quiz show" by some reviewers  which is an exaggeration. That he was unprofessional, badgering and picking fights.  Plaintiff told UC Holcomb it may be that the  reviewers are not New Yorkers and because of Plaintiff's Chinese accent since English was Plaintiff's second language.  Plaintiff was told to speak like Winnie the Pooh who was unfamiliar to the Plaintiff.  Plaintiff was then told to speak and act like a hotel concierge. They were attacking Plaintiff's Asian heritage. Plaintiff has never been told that he had a problem communicating.  Plaintiff was basically told that he was not up to the standards of a white male and did not speak English correctly.

71.   Plaintiff was accused by UC Holcomb and SC Malone of data collection errors, in essence, he was being accused of ethical and integrity issues.  UC Holcomb said integrity goes to OPR, kicking a chair or improperly marking responses or chart notations are ethical issues. These claims were and are totally false and they knew it.  It was being used solely for the purpose of forcing Plaintiff to leave the polygraph unit.

72.   Plaintiff was accused of intentionally turning down the seat sensor in several exams to avoid detection of movements and manipulating other sensors. Plaintiff denied any such activity during any exam.

73.   Plaintiff was accused of not paying attention and he was intentionally looking to pass the applicant' movements and pushing exams as inconclusive rather than a passing result which NCCA sees as an ethical problem. Then he was accused of using broken equipment. UC Holcomb said a few of Plaintiff's exams had audio failures and several of them were on exams with seat sensor issues.  While Plaintiff uploaded back-up recorded audio, UC Holcomb did not review the audio back-up files in the exams UC Holcomb alleged Plaintiff was conducting unethical violations by my messing with the sensors.

74.   UC Holcomb wanted Plaintiff to accept the allegations set forth in ¶¶ 69, 70 and 71even though they were false.  It was intimidation against the Plaintiff who was just a few months earlier the "go to guy" until his testimony in the SA Matt EEO case.

75.   UC  Holcomb said all of the reviewers and he suspected there were distractions and/or outside noises that were influencing Plaintiff in his conduct of exams and wanted to discuss training.  However, if remedial training was required,  Plaintiff  would still be required to travel and conduct back-to-back exams which makes no sense if he was allegedly such a bad polygraph examiner.   At this point UC Holcomb would not disclose the names of the reviewers.

76.  Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by or resulted from Plaintiff's participation  in the aforementioned Matt EEO case as a witness, a protected activity.

77.  Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper

### THIRD CAUSE OF ACTION

### DISABILITY DISCRIMINATION UNDER THE REHABILITATION ACT

### OF 1973, AS AMENDED

78**.**  Plaintiff repeats and realleges Paragraphs1 through 77 of the Complaint as if fully set forth herein.

79.  On March 16, 2020, by email to the polygraph unit regarding the pandemic, everyone was told that they should take care of themselves and their families.

80.  On May 6, 2020, SC Lambert stated the based-on Plaintiff's asthma status, Plaintiff should be out of the testing room for a while due to the highly contagious respiratory Covid-19 disease. Asthma is recognized by the American With Disabilities Act and the Rehabilitation Act of 1973, Section 504, as amended as a disability subject to the requirements of both statutes.

81.  On April 23, 2020, UC Holcomb emailed the polygraph unit with regard to having "high-risk health conditions, such as moderate to severe asthma or high-risk family members". Plaintiff responded and informed him of his pre-existing asthma condition. Plaintiff was told not to worry about any accumulations of applicants assigned to his queue.  UC Holcomb said "we are not going to send you to your death".

82.   On June 16, 2020, UC Holcomb explained how he handled exams during this period of time. On June 23, 2020, SC Lambert and Plaintiff discussed alternate locations to conduct exams so as to help mitigate covid exposure for Plaintiff .

83. The Agency personnel, including UC Holcomb and SC Malone, despite being well aware of Plaintiff's disability that placed him at high risk with Covid-19, during the August 16, 2021 meeting they continually badgered Plaintiff on being afraid of Covid and proceeded to order him to immediately travel more both domestically and to foreign locations which he did in July and August 2021.

84.   During the August 16, 2021 meeting, UC Holcomb stated that "we cannot have you on the bench" because of the pandemic which violates the Rehabilitation Act provisions  with respect to individuals who have a disability. It was also further retaliation for Plaintiff's EEO interview in the SA Matt EEO case.

85.   Plaintiff never requested to limit or otherwise reduce his responsibilities in conducting polygraph examinations throughout the pandemic based on his disability yet it was used to attack him and his work.

86.   Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by and/or resulted from Plaintiff's disability.

87.   .  Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper.

FOURTH CAUSE OF ACTION

RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF

THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

88.  Plaintiff repeats and realleges the allegations set forth Paragraphs 1 through 87 in the

Complaint as if set forth in full.

89.  On August 16, 2021, at 4:03 p.m. a few hours after the meeting with UC Holcomb and SC

Malone, Plaintiff received an email from UC Holcomb which was copied to SC Malone, STCP

ASAC Mary Toomey, NYFD ASAC Wesley Fritz and NYFD GS Jerry Callahan which included

all of the alleged deficiencies, that Plaintiff would have to travel two weeks per month, criticized

Plaintiff's productivity, said Plaintiff was incompetent in his speech, thought process and

operation of polygraph equipment, and all of Plaintiff's work going forward would be scrutinized

and if any critical errors he would remove Plaintiff from the unit. It was demeaning, inaccurate

and intended to embarrass and shame the Plaintiff. At this point Plaintiff was an emotional

wreck.

90.  At  4:14 p.m. on August 16, 2021, UC Holcomb sent Plaintiff another email and copied

SC Malone. It was another harassing and demeaning email and a reminder regarding Covid-19

protocols.

91.  On August 17, 2021 at 8:57 a.m., SC Malone with a copy to UC Holcomb emailed the

Plaintiff ordering Plaintiff to provide him with Plaintiff's schedule for the next two weeks and

any scheduled approved leave time. SC Malone knew Plaintiff was traveling so he requested the

information the next day to discuss travel.

92.  On August 17, 2021 at 4:46 p.m. UC Holcomb emailed the Plaintiff and copied SC

Malone .  Attached were 3 audio files of UC Holcomb's previous exams. These were intended to

"allow" Plaintiff to learn how to speak, sound and act more like him during an exam.  Each audio was 4-6 hours long.  UC Holcomb expected Plaintiff to listen to 18 hours of Holcomb's performances as a polygraph examiner.

93.   On August 18, 2021 at approximately 11:03 p.m. Plaintiff responded to Malone and Holcomb, informed them he had no leave scheduled  and he would work with them on travel plans.  The pressure was being increased by Holcomb and Malone to try to force Plaintiff to withdraw from the unit.

94.   On August 18, 2021 at approximately 12:25 p.m. Plaintiff received a call from both SC Malone and UC Holcomb.  They ordered Plaintiff to travel to Houston, TX for a two-week period the following week, Sunday August 22, 2021, with a 4-day notice. They never asked if Plaintiff had any childcare issues or any obligations at the NYFD. They said they would allow Plaintiff  to return home for one day, on the weekend, if and only if he obtained conclusive results for the first week of exams.  No one, in anyone's memory and certainly not in Plaintiff's 8.5 years with the unit, had ever been treated in this fashion by the STCP management. The harassment and hostile environment was severe and certainly pervasive.

95.   On Wednesday August 18, 2021, at approximately 1:00 p.m. Plaintiff met with ASAC Fritz in his office. He said he read the earlier email to all parties and stated the "Clearly they don't want you there and you don't want to n be there". Fritz told Plaintiff he could get Plaintiff assigned  to the Technical Operations Group as a Tech Agent.  Fritz wanted Plaintiff to decide immediately and said he could get it approved by NYFD SAC Ray Donovan immediately.  Fritz never defended Plaintiff or asked about his performance. Plaintiff did not know what a Tech Agent's duties entailed. Plaintiff was advised to speak with Acting GS Espinoza.  Plaintiff had never been a Tech Agent despite being in the Tech Support Group.

96.   Also on  Wednesday, August  18, 2021, SC Malone emailed Plaintiff again. Documenting the telephone conversation with the same orders and threats. This was the straw that broke the camel's back.  Plaintiff would have to be away from his 2.5-year-old daughter 6 months a year if he was with the polygraph unit. Plaintiff was distraught. He discussed the matter with his wife who stated they would be unable to survive if he stayed with STCP.  Plaintiff knew UC Holcomb, SC Malone, ASAC Toomey and SAC Machak would do everything possible to harass him, threaten him and continue to require him to perform his polygraph duties in a very severe hostile work  environment.   It would be unbearable and a lose-lose situation for Plaintiff.

97.   Prior to meeting with Holcomb and Malone on August 16, 2021, Plaintiff had spoken with Deputy SAC ("D/SAC") Keith Kruskall and told him that he was afraid and concerned about being summoned to STCP because of his involvement/participation in the James Matt EEO case.  Plaintiff had found a note in a file from UC Holcomb that accused Plaintiff of intentionally affecting or altering polygraph test data, all of which was false. D/SAC Kruskall requested that Plaintiff visit him when he returned from STCP.

98.   The day after the STCP meeting D/SAC Kruskall texted Plaintiff  "Are you okay?" Plaintiff replied "Not really". They set the next day to meet. Plaintiff explained what happened and the harassment beginning in 2019 and the all actions, including those of ASAC Fritz, ASAC Toomey, UC Holcomb and SC Malone were related retaliation for participating in the Matt EEO case. During the meeting ASAC Fritz called Plaintiff to inform him that he had received approval from SAC Donovan for Plaintiff's transfer to the Tech Agent position.  ASAC Fritz also directed Plaintiff as to what verbiage to use in withdrawing from STCP so as to not give the appearance that Plaintiff was forced out of the unit.  Plaintiff was to use that "I respectfully withdraw…" ASAC Fritz was manipulating Plaintiff in favor of UC Holcomb, SAC Machak, ASAC Toomey

and SC Malone. This was confirmed when Plaintiff was told by GS Espinoza to "Let it go" and Fritz directed Plaintiff not to go to OPR. It was also a threat to not file an EEO complaint. It was as Plaintiff believed, a conspiracy to protect STCP management personnel, including SAC Machak.

99.   On August 18, 2021 at 6:17 p.m. UC Holcomb responded to Plaintiff's "withdrawal" and cc'd Malone, Fritz, Toomey and Espinoza. Holcomb took what appeared to be a final swipe at Plaintiff by stating that Plaintiff left the unit because of the demands and challenges inherent in the job.  Holcomb knew it was a lie but he said it any way. He had succeeded in his harassment, retaliation and assassination of Plaintiff's character, integrity, reputation and work ethic through racial discrimination, age discrimination, gender, reprisal for plaintiff's participation in protected activity  and creating and maintaining a hostile work environment.

100.   UC Holcomb, SC Malone, ASAC Toomey and SAC Machak were all involved in the retaliatory hostile environment foisted upon the Plaintiff intended to force Plaintiff to withdraw from the polygraph unit as indicated by a series of emails that occurred from August 15 through August 18, 2024 and subsequent to Plaintiff's email withdrawal as follows:

a.   On August 15, 2021, ASAC Toomey emailed UC Holcomb and wrote FYSA (For Your Situational Awareness) and forwarded the CER email sent by UC Holcomb to Plaintiff notifying her that he was abusing Plaintiff with a last minute 62-page document which included abusive language.

b.   On the morning of August 16, 2021, the day of the meeting, ASAC Toomey emailed UC Holcomb stating "after you and Bernie (SC Malone) speak to him, please come by my office". She sent another email a few minutes later asking if Paul (SC Paul Moloney) is going to

have the memo this morning?  I do not want to brief Mike (Machak) until I read it.  This memo is believed to contain the list of deficiencies used that morning to attack the Plaintiff.

    c.  At 10:47 that same day ASAC Toomey emails ASAC Fritz in New York. She states: "as you probably know the polygraph management team is meeting with James this morning regarding his performance as it to poly. Once they come brief me afterwards, I will call you to discuss the plan forward".  ASAC Fritz was aligned with the STCP management to assure that Plaintiff would withdraw from the Poly unit as it was planned by them.

    d.  At 6:31 p.m., Toomey forwarded Holcomb's performance expectations and training plan email to Machak. She wrote, "**<u>Per our conversation</u>** and if you have about a half a day please read at your leisure."

    e.  On August 17, 2021 at 8:21 a.m., MACHAK replies to TOOMEY. Machak said, "Good email, very thorough- crappy part is in some ways it gives people a reason to question us - bc examiner is making mistakes".

    f.  At 8:34 a.m., Toomey replied to Machak. She said, 'Yes. But we are trying to correct him and his mistakes haven't compromised the exams or he would have been removed. Question is - can he correct himself.

    g.  On August 18, 2021 at 5:17 p.m., Toomey emailed Machak. She wrote, "Also James Li is  leaving poly on his own accord and choice. I spoke to Wes Fritz and they are good with  it. We will open the NY vacancy next week. Upon information and belief, ASAC Toomey was obviously in contact with ASAC Fritz and was working with STCP to force Plaintiff to withdraw from the polygraph unit.

    h.  SAC Machak replies ok.  " I think it is important to document it so he can't come back and accuse us … like subsequent to addressing performance issues he voluntarily left on

his own choice."  The STCP management knew it had forced Plaintiff to withdraw from the polygraph unit and was covering their tracks.

.

i.   Later, at approximately 5:28 p.m., ASAC Toomey emailed SAC Machak again saying: James will do an email to Dan cc'ing me and his chain of command up to Wes (ASAC Fritz).  Dan (UC Holcomb) will respond to that email with directions for his pending exams and equipment. …"  This is another example of how this whole withdrawal scenario was played out to try to prevent Plaintiff from claiming he was forced to withdraw from the unit, which he was even before he sent his withdrawal email.

j.   At 6:10 p.m., Plaintiff sent the withdrawal email.  At 6:17 p.m., UC Holcomb responded by sending a condescending email thanking the Plaintiff for his years of service. By 6:59 p.m. UC Holcomb had already prepared and electronically signed and dated a memorandum addressed to SAC Machak informing him of Plaintiff's withdrawal from the polygraph unit. By 7:14 p.m., UC Holcomb had already prepared and electronically signed a memorandum to NCCA decertifying Plaintiff.  In just a few minutes more than one hour, UC Holcomb rushed to have Plaintiff decertified as a DEA polygraph examiner. At 8:25 p.m., ASAC Fritz emailed UC Holcomb stating:  "Thanks, Dan.  All worked out in the end". Holcomb replied, "It did.  Thanks for the assistance with this". UC Holcomb knew that ASAC Fritz was an essential player in forcing Plaintiff to withdraw from the polygraph unit, all to the detriment of the Plaintiff.

101.  On January 6, 2023, Plaintiff filed a complaint with the DOJ OIG reporting fraud, abuse and misconduct by Machak's polygraph unit. Said complaint also included allegations of tampering of polygraph results by polygraph management.  Plaintiff was never interviewed regarding these complaints he made as a whistleblower.

102.  At some point in time thereafter or prior to Plaintiff's complaint to OIG, SAC Machak made false allegations against the Plaintiff to OIG, the same SAC Machak who participated in Plaintiff's forced withdrawal from the polygraph unit.

103.  In March 2023, as a result of SAC Machak's false claims, Plaintiff was placed on limited duty pending an investigation by DOJ OIG.  He was stripped of his weapon, badge, government vehicle and credentials which is another form of retaliation by STCP management. In December 2023, Plaintiff was cleared by the DEA Board of Professional Conduct  and forced to immediately retire  to leave in good standing knowing if he stayed UC Holcomb and the STCP management would continue to find ways to retaliate against him with the assistance of NYFD personnel. Plaintiff retired from DEA in January 2024 at the age of 49, having lost 8 more years of eligibility and income serving as a DEA Special Agent.

104  In late January early February 2023, Plaintiff assisted DOJ OIG with their audit of the DEA Polygraph Program. Plaintiff provided a great amount of detail on gross misbehavior within the polygraph program.  None of the information was included in the DOJ OIG's August 23, 2023 Management Advisory Memorandum regarding the DEA's use of polygraph.

105.  However, going back to the actions of UC Holcomb and the STCP management, on September 25, 2021, Holcomb, not satisfied that he had forced Plaintiff's withdrawal from STCP, issued his portion of Plaintiff's performance evaluation and lowered the prior year evaluation by two levels, from Outstanding to Acceptable. Plaintiff did not sign the performance evaluation.

106.   On October 8, 2021, GS Espinoza told Plaintiff to contact  GS Callahan because he had not yet signed the performance evaluation.  Plaintiff called GS Callahan who told him ASAC Fritz wanted it signed immediately.  Plaintiff told GS Callahan he was going to grieve the performance evaluation. GS Callahan said he would have to grieve it with STCP, which was erroneous.  Plaintiff missed a call from GS Callahan but Callahan sent Plaintiff a text.  Plaintiff called Callahan who told Plaintiff "they might reevaluate so don't do anything to blow up something that cannot be fixed".  He said wait a few days.

107.   On Saturday, October 9, 2021 at 12:17 P.M. Holcomb electronically amended STCP's part of Plaintiff's rating (performance evaluation) to "Excellent".

108.  Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by and/or resulted from Defendant's establishment and continued retaliatory hostile work environment.

109.  Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper.

## FIFTH CAUSE OF ACTION

## VIOLATION OF TITLE VII, CIVIL RIGHTS ACT OF 1964, AS AMENDED

## BASED ON RACIAL DISCRIMINATION

110.   Plaintiff repeats and realleges Paragraphs 1 through 109 of the Complaint as if fully set forth herein.

111.   Plaintiff was the sole Asian American in the polygraph unit.  He was a senior examiner with over 8 years of polygraph experience. In September/October 2020. UC Holcomb rated Plaintiff performance as outstanding adding the Plaintiff was "his go to guy" for challenging or difficult cases.  Yet, despite Plaintiff making several requests to be elevated to a Quality Control position or be a team leader on foreign assignments, he was always overlooked or ignored.  In fact, examiners with less seniority as examiners and as Special Agents, were offered those positions.  All of the individuals so elevated were non-Asian males and females.

112. On March 30, 2021, SA Sampson, who was assigned Quality Control ("QC" ) for an exam called Plaintiff to discuss one of his exams. Plaintiff was unable to do so at that time as he was in his car and said they should agree to disagree and simply send the exam forward for a Second Opinion ("SO").  Sampson did not want to do this because if the SO agreed with Plaintiff, then SA Sampson would look bad.  Later Plaintiff asked SA Stephenson to review the exam charts. SA Stephenson told SA Sampson and he was furious. SA Sampson threatened Plaintiff with telling UC Holcomb that Plaintiff did not listen to him. SA Sampson was a junior Special Agent and junior examiner to Plaintiff.  SA Sampson did not appreciate being questioned by a minority individual despite Plaintiff's  seniority.

113.   On August 20, 2021, Plaintiff was informed by SA Stephenson that three non-Asian examiners were given the opportunity for remedial training via remote.  Plaintiff was being required, following the August 16, 2021 meeting, to travel to NCCA, all his exams would be reviewed twice and every fifth exam the audio would be reviewed.  All non-Asian individuals were afforded a one-week remedial; Plaintiff was not.

114.   Plaintiff was also informed that no one else in the polygraph unit was required to be away from home (TDY) two weeks per month other than plaintiff.   In fact, SA Stephenson, a

white female, had only traveled one week since the pandemic began and others had hardly traveled at all during the pandemic but Plaintiff was criticized for and attacked for not traveling enough. All of these individuals were non-Asian. The environment had become very hostile and more hostile than ever since April 21, 2021, the date of Plaintiff's EEO interview.

115. Plaintiff was treated in a disparate manner because of his race throughout his entire career. It was ramped up starting in 2019, accelerated in 2020 and continued through most of 2021 by the actions of DEA Polygraph unit management personnel, examiner personnel and NYFD personnel until his departure from the polygraph unit in late August 2021.

116. Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by and/or resulted from Plaintiff's race, Asian.

117. Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper.

SIXTH CAUSE OF ACTION

VIOLATION OF TITLE VII, CIVIL RIGHTS ACT OF 1964, AS AMENDED

BASED ON SEX/GENDER DISCRIMINATION

118. Plaintiff repeats and realleges Paragraphs 1 through  117 of the Complaint as if fully set forth herein.

119. In May 2021, UC Holcomb scheduled a training seminar that everyone was required to attend. It was mandatory for all Special Agents. Plaintiff advised UC Holcomb that he was concerned about a packed room during the pandemic because of his disability, asthma. UC

Holcomb stated all precautions would be taken and that plaintiff had to be there. As it turned out only four people wore masks. Plaintiff asked if he could attend virtually or remotely because of a baby at home and elderly parents.  Both UC Holcomb and SC Malone said he was required to attend in person. Plaintiff  was denied the opportunity to attend remotely in my home.

120.   SA Stephenson, a white female, was allowed to attend remotely and listened to the training session at home.

121.   SA Margarita Ojeda, a female, had to attend a wedding so she was allowed to leave the seminar early.

122.   SA Stephenson, a white female, did not conduct a single exam from February 2020 to at least August 2021 without any consequences or questions about her productivity and served as a reviewer on one of the CER's ordered by UC Holcomb regarding Plaintiff's exams.

123.   SA Marisssa Vraa-Jones, a white female, minimally conducted exams because her husband was a DEA supervisor and they had two children at home.  Her productivity was never questioned yet Plaintiff was attacked and demeaned in August 2021 for conducting significantly more than  40 exams in FY2021 even though his vaccine protocol was not completed until February 2021.

124.   As stated above, white females as well as white, non-Asian white males in the polygraph unit were allowed to conduct fewer exams than the Plaintiff but were not chastised, demeaned or attacked verbally and professionally by STCP management personnel.

125.   Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by and/or resulted from Plaintiff's gender/sex being a male.

126.  Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper

SEVENTH CAUSE OF ACTION

VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, AS AMENDED

127.  Plaintiff repeats and realleges  Paragraphs 1 through 126 of the Complaint as if set forth herein.

128.  On or about March 21, 2021, Plaintiff was present at STCP for a polygraph unit conference where he met SC Malone for the first time. SC Malone directed Plaintiff to follow him to his office where SC Malone wanted to get to know Plaintiff.  SC Malone asked the Plaintiff about how long he had been an agent; how old Plaintiff was; whether Plaintiff spoke Chinese, about Plaintiff's family  and if Plaintiff had any hobbies.  When Plaintiff offered his age, SC Malone stated: "DEA is a young man's game".

129.  On August 16, 2021, after engaging in abusive and demeaning conduct toward the Plaintiff, UC Holcomb attempted to badger Plaintiff one additional time at the conclusion of the meeting.  UC Holcomb asked how much longer the Plaintiff was required to work until retirement eligibility.  UC Holcomb then said he did not see the amount of work and travel to slow down for many years given the backlog of exams because of the pandemic.  Given that SA Matt had filed an EEO complaint against ASAC Toomey and Holcomb for age discrimination, it was clear to the Plaintiff that UC Holcomb was threatening Plaintiff that he would be required to work and travel much harder and more often as Plaintiff aged.

130.  Plaintiff has sufficiently alleged that he was subjected to a discriminatory employment practice, namely forced to withdraw from the polygraph unit and said involuntary withdrawal was caused by and/or resulted from Plaintiff's age.

131.  Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorney's fees, administrative costs and all other relief that this Court deems just and proper

## STATEMENT OF CLAIM FOR RELIEF

WHEREFORE, Plaintiff prays that this Court will:

 a.  Find that the Defendant violated Title VII of the Civil Rights Act of 1964, as amended for retaliation, racial discrimination, sex discrimination and retaliatory hostile work environment :

 b.  Find that the Defendant violated the Age Discrimination in Employment Act of 1967, as amended;

 c.  Find that  the Defendant violated the Rehabilitation Act of 1973, as amended for discrimination based on disability and retaliation under the same Act;

 d.  Award compensatory damages to Plaintiff, including but not limited to back pay and other monetary benefits due and owed to him;

 e.  Award compensatory damages to Plaintiff for the pain, suffering, emotional distress, loss of dignity, loss of reputation, humiliation and livelihood endured by Plaintiff in the amount totaling  $750,000.00;

 f.  Award Plaintiff punitive damages in an amount to be determined at trial;

 g.   Award Plaintiff all reasonable Attorneys' fees and costs, including expert fees,

of this action; and

h. Grant Plaintiff such other and further relief as this Court deems appropriate and just.

Dated: August 14, 2024

Respectfully submitted,

Plaintiff, James Li, By his Attorney

/s/ Raymond Mansolillo
 Raymond Mansolillo Esq.

 Main Office:  One Marina Park Drive, Suite 1410 Boston, MA 02210
 Tel. 401.640.4225
 Email. rmansolillo@cox.net
 Satellite Office: 14 Wall Street, FLR 20 New York, 10005
 Bar Code No. 5371075

## CERTIFICATE OF SERVICE

I certify that the aforementioned complaint was filed electronically via CM/ECF on

August 16, 2024

/s/ Raymond Mansolillo Raymond Mansolillo